HEATHER A. BARRETT

VERSUS

CHRISTOPHER J. BARRETT

NO. 20-CA-266

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 749-649, DIVISION "C"
HONORABLE JUNE B. DARENSBURG, JUDGE PRESIDING

February 24, 2021

**HANS J. LILJEBERG**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and Hans J. Liljeberg

<u>**AFFIRMED**</u>
**HJL**
**SMC**
**MEJ**

COUNSEL FOR PLAINTIFF/APPELLANT,
HEATHER A. BARRETT
    Lorna P. Turnage

COUNSEL FOR DEFENDANT/APPELLEE,
CHRISTOPHER J. BARRETT
    A. Scott Tillery

**LILJEBERG, J.**

Plaintiff/Appellant, Heather A. Barrett, appeals the trial court's February 4, 2020 judgment addressing issues of custody, child support and contempt of court. For reasons stated more fully below, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL BACKGROUND

Heather Barrett and defendant/appellee, Christopher J. Barrett, were married on February 24, 2007, and have three boys, ages ten, nine and seven. In June 2014, Mr. Barrett was rendered blind after he was shot in the face while hunting. On May 13, 2015, Ms. Barrett filed a petition for protection from abuse and on May 15, 2015, she filed a petition for divorce. On June 17, 2015, Ms. Barrett dismissed her petition for protection from abuse and the parties entered into a consent judgment, signed by the trial court on July 27, 2015, granting Ms. Barrett "temporary custody" and visitation for Mr. Barrett on alternating weekends and each week from Tuesday morning to Wednesday evening. The consent judgment required Mr. Barrett's visitation to be assisted until he completed a program for the blind. With respect to child support, the parties agreed, as follows, that the social security benefits the children received due to Mr. Barrett's disability would serve as his child support payment:

> Heather Barrett will receive the SSI benefits for the children (now $166.00 per child or a total of $498.00 per month) in lieu of child support . . ..

On July 1, 2016, Mr. Barrett filed a Rule to Show Cause for divorce and for modification of the custody agreement to have the supervision requirement lifted from his visitation with the children. The court granted a judgment of divorce on July 29, 2016. On September 23, 2016, the parties met with the hearing officer and stipulated, on an interim basis, to joint custody with Ms. Barrett designated as the domiciliary parent and visitation for Mr. Barrett on alternating weekends. The parties agreed that Mr. Barrett would not be required to have assistance or

supervision during his visitation unless he took the children on a boat. The parties further agreed that they would not use vulgarity or make any statements against third parties in the presence of the children, and would not bathe or sleep in the same bed with the children. In their co-parenting guidelines, the parties also agreed that if a parent required child care for 24 hours or longer, then the other parent shall have the first option to have the children. On December 12, 2016, the trial court signed an "Interim Consent Judgment Without Prejudice" setting forth the parties' stipulations. This judgment provided that either party could "seek its modification without any double burden of proof."

On June 12, 2019, Ms. Barrett filed a Rule for Ex-Parte Custody, Rule to Modify Custody and Other Ancillary Matters. In her rule, Ms. Barrett first requested temporary sole custody alleging that she feared for the safety of her children because Mr. Barrett is visually impaired and has unsupervised visitation. In support of this request, she alleged that on June 6, 2019, Mr. Barrett took the children fishing on the bank of the Mississippi River without life vests. She alleged that Mr. Barrett fell into the river and their nine-year-old son, diagnosed with autism, also fell into the river while attempting to assist his father. Their oldest son then helped them both out of the water. Ms. Barrett alleged that the water level on the Mississippi River is extremely high and dangerous. She claimed that Mr. Barrett failed to report this incident to her and that he ignored her requests not to fish with the children unsupervised. She also alleged that while fishing with Mr. Barrett on February 24, 2018, their oldest son got a fishhook embedded in his finger that required a trip to the emergency room to remove.

Ms. Barrett also complained that Mr. Barrett allowed the children to swim in the pool at his house without a "sighted" individual present. She claimed that on May 30, 2018, their autistic child hit his head on the side of the pool and had to be assisted by his older brother. She further alleged that the children had constant ear

infections because Mr. Barrett allowed them to swim most of the day and did not properly care for their ears. She claimed that their pediatrician told her the ear infections may be due to exposure to cigarette smoke. She also expressed concerns about the children administering their own medicine when with their father and Mr. Barrett's alleged failure to use a booster seat for their oldest son.

Based on these allegations, Ms. Barrett asked for temporary sole custody and thereafter, permanent custody with supervised visitation for Mr. Barrett. She asked that the court require supervision for the children to swim at Mr. Barrett's home and that no one be allowed to smoke where the children are present.

Ms. Barrett also requested an increase in child support based on her allegation that Mr. Barrett was working and receiving income in addition to his disability benefits. She complained that in August 2018, Mr. Barrett sold his home for $214,000.00 and bought a new home for $270,000.00, while she supports three children on the disability benefits she receives. She also complained that Mr. Barrett refused to assist her with extracurricular and school expenses for the children, and asked that the court order him to pay his pro rata share.

In addition to her requests for sole custody and an increase in child support, Ms. Barrett also requested that Mr. Barrett be held in contempt of court. She first alleged that Mr. Barrett violated their agreement not to sleep in the same bed with the children. She alleged that Mr. Barrett admitted to violating this provision and the children told her that Mr. Barrett's girlfriend also slept in the same bed with them. In addition to requesting contempt, Ms. Barrett also asked the court to order that Mr. Barrett is not allowed to have a female with whom he is romantically involved spend the night when the children are in his care.

Ms. Barrett also accused Mr. Barrett of contempt of court for using vulgarity and making statements against third parties while in the children's presence, as well as for violating the co-parenting guidelines. She alleged that at a pre-K

graduation ceremony, Mr. Barrett referred to her step-father as a "fat ass" in front of the children.[1] Ms. Barrett finally claimed that Mr. Barrett violated the co-parenting guidelines when he failed to give her a right of first refusal to care for the children on two occasions when he went away for the weekend and left the children with his mother.

On June 12, 2019, the commissioner denied Ms. Barrett's request for temporary sole custody, but entered an order that prohibited Mr. Barrett from taking the children fishing or allowing them to swim, unless an adult without vision impairment was present. The commissioner also set Ms. Barrett's rule for a hearing officer conference on August 8, 2019.

On July 18, 2019, Mr. Barrett filed a rule requesting shared custody of the children based on allegations that the children suffered harm and risk due to Ms. Barrett's alleged failure to properly supervise the children. Mr. Barrett also requested a recalculation of child support based on a shared custody arrangement and to be allowed to claim the dependency tax deductions for the children.

At the August 8, 2019 hearing officer conference, the parties entered into several stipulations prohibiting the parties from smoking in the presence of the children and allowing them to administer medicine. The hearing officer recommended that Mr. Barrett be prohibited from fishing with the children directly on the river without supervision, but allowed fishing without supervision on the river batture as long as the children wore life jackets. He also recommended that overnight guests of the opposite sex, who are not related by blood or marriage, be allowed when the children were present if the party has been in a committed relationship with the person for over a year. The hearing officer denied Mr. Barrett's request to claim the children as dependents for tax purposes, and referred

---

[1] Ms. Barrett's stepfather is the individual who shot Mr. Barrett during the hunting incident which rendered Mr. Barrett blind.

the issues of custody, child support and contempt to the trial court for an evidentiary hearing. Immediately following the hearing officer conference, the parties filed a joint objection to all of the hearing officer's recommendations.

The evidentiary hearing before the trial court occurred on November 12 and 13, 2019, and following the hearing, the parties submitted post-trial memoranda. On February 4, 2020, the trial court entered a judgment adopting the hearing officer's recommendations regarding fishing and overnight guests. The trial court further determined that the parties shall continue to share joint custody with Ms. Barrett designated as the domiciliary parent. It awarded Mr. Barrett visitation from Friday at 7:00 p.m. to Sunday at 6:00 p.m. "to coincide with the children's cousins weekend. To accomplish this goal plaintiff Heather Barrett will have 2 weekends back to back."

The trial court denied Ms. Barrett's request to increase child support and further ordered that Mr. Barrett could claim the federal and state tax dependency for the second child. The trial court ordered Mr. Barrett to pay half of the total amount of the children's baseball activity expenses, not to exceed $75.00 per child. Finally, the trial court denied Ms. Barrett's request to hold Mr. Barrett in contempt.

On March 5, 2020, Ms. Barrett filed a timely motion for appeal, which the trial court granted on March 13, 2020. On April 23, 2020, the trial court issued written reasons for its February 4, 2020 judgment.

## DISCUSSION

*Child Support*

In her first assignment of error, Ms. Barrett argues for the first time on appeal that the trial court legally erred in denying her request to increase the child support award and requiring her to demonstrate a change in circumstances, because

the trial court relied on a flawed stipulated child support award.[2]  Ms. Barrett

contends that the stipulated award is flawed because the commissioner failed to

properly consider the Louisiana Child Support Guidelines, La. R.S. 9:315, *et. seq.*

("guidelines"), prior to accepting the July 27, 2015 consent judgment.  She also

contends that the stipulated child support award agreed to by the parties in 2015

deviated from the guidelines.

La. R.S. 9:315.1 provides the following requirements regarding child

support stipulations relevant to this matter:

> B. (1) The court may deviate from the guidelines set forth in this Part
> if their application would not be in the best interest of the child or
> would be inequitable to the parties. The court shall give specific oral
> or written reasons for the deviation, including a finding as to the
> amount of support that would have been required under a mechanical
> application of the guidelines and the particular facts and
> circumstances that warranted a deviation from the guidelines. The
> reasons shall be made part of the record of the proceedings.

> * * *

> D. The court may review and approve a stipulation between the
> parties entered into after the effective date of this Part as to the
> amount of child support to be paid. If the court does review the
> stipulation, the court shall consider the guidelines set forth in this Part
> to review the adequacy of the stipulated amount and may require the
> parties to provide the court with the income statements and
> documentation required by R.S. 9:315.2.

The parties agree that in *Stogner v. Stogner*, 98-3044 (La. 7/7/99), 739 So.2d

762, 768, the Louisiana Supreme Court analyzed these provisions and determined

the requirements set forth in La. R.S. 9:315.1(D) were not discretionary.  The

supreme court declared that trial courts must consider the guidelines to review the

---

[2] In its reasons for judgment, the trial court explained that because the amount of child support was
previously agreed to by the parties, Ms. Barrett was required to prove a material change in circumstances.
In her post-trial memorandum submitted to the trial court, Ms. Barrett did not argue that the July 27, 2015
consent judgment was invalid, thereby relieving her of the obligation to demonstrate a change in
circumstances to obtain an increase in the child support award.  Rather, when explaining the law governing
her request, she cited to and quoted the portion of La. R.S. 9:311, which states that a party seeking a
modification of child support must show a material change in circumstances.  Generally, appellate courts
do not consider issues raised for the first time on appeal, unless the interest of justice clearly requires
otherwise. *See* Uniform Rules—Courts of Appeal, Rule 1-3.  We will consider the merits of this assignment
of error, however, to ensure that the parties' obligations to adequately support their three children were
upheld by the trial court.

adequacy of the stipulated amount and provide reasons if it allows a deviation from the guidelines. *Id.* The *Stogner* court determined that the prior child support award stipulated to by the parties and approved by the trial court was invalid because the trial court failed to follow the requirements of La. R.S. 9:315.1 prior to allowing the deviation from the guidelines. Therefore, the supreme court determined it was improper for the lower courts to rely on the flawed award in denying the mother's request to modify the child support award. *Id.* at 769.

Unlike *Stogner*, however, we do not find any evidence in the record that the July 27, 2015 stipulated child support award deviated from the statutory child support guidelines. As explained above, the parties agreed that the $498.00 in social security disability benefits the children received due to Mr. Barrett's disability would serve as his child support payment. Ms. Barrett did not argue in the lower court that this stipulated amount deviated from the guidelines and she does not provide an explanation regarding the alleged deviation in her appellate brief.

We assume, based on arguments Ms. Barrett raises in her second assignment of error, that she contends the 2015 stipulated award deviated from the guidelines because the commissioner did not deduct the social security disability benefits from the basic child support obligation, but rather allowed the $498.00 in social security disability payments to serve as a credit towards Mr. Barrett's child support obligation.[3] It is well-settled, however, that La. R.S. 9:315.7(D) provides for a parent, such as Mr. Barrett, to receive a credit toward his child support obligation for social security disability payments his children receive due to his disability:

> (D) Notwithstanding the provisions of Subsection C of this Section, social security benefits received by a child due to earnings of a parent shall be credited as child support to the parent upon whose earning

---

[3] As discussed more fully below, Ms. Barrett argues that pursuant to La. R.S. 9:315.7(A), the social security benefits should be considered income of the children and deducted from the basic child support obligation, which according to the guidelines and income of the parties is $915.00.

record it is based, by crediting the amount against the potential obligation of that parent.[4]

*See also State, Dept. of Social Services in Interest of B.B. v. C.B.*, 14-360 (La. App. 5 Cir. 10/29/14), 164 So.3d 850, 852-53, *writ denied*, 14-2498 (La. 1/16/15), 157 So.3d 1133 (pursuant to La. R.S. 9:315.7(D), father was entitled to credit against his child support obligation for social security benefits the child received due to the father's disability); *Flickinger v. Flickinger*, 05-2228 (La. App. 1 Cir. 12/28/06), 952 So.2d 70, 73; *Genusa v. Genusa*, 09-917 (La. App. 1 Cir. 12/23/09), 30 So.3d 775, 779-80.

In arguing that the social security disability payments should be deducted from the basic child support obligation, Ms. Barrett ignores this Court's precedent in *State, Dept. of Social Services in Interest of B.B, supra,* and instead cites to *Salles v. Salles*, 04-1449 (La. App. 1 Cir. 12/2/05), 928 So.2d 1, decided by the First Circuit prior to the legislature's enactment of Section D of La. R.S. 9:315.7 in 2006. *See* La. Acts 2006, No. 386, § 1. In *Salles*, the First Circuit treated social security benefits received by the child as income that should be deducted from the basic child support obligation pursuant to La. R.S. 9:315.7(A).[5] Ms. Barrett fails to recognize that subsequent to its decision in *Salles*, the First Circuit recognized in *Flickinger* and *Genusa, supra,* that the legislature amended La. R.S. 9:315.7 to add Subsection D, thereby requiring the court to credit the social security benefits to the parent's child support obligation, rather than deducting the benefits from the basic child support obligation as income of the child benefitting both parents under Section A.

---

[4] La. R.S. 9:315.7(C) provides: "The provisions of this Section shall not apply to benefits received by a child from public assistance programs, including but not limited to Family Independence Temporary Assistance Programs (FITAP), food stamps, or any means-tested program." It is not applicable to the issue before this Court.

[5] La. R.S. 9:315.7(A) provides: "Income of the child that can be used to reduce the basic needs of the child may be considered as a deduction from the basic child support obligation."

Ms. Barrett also argues that the record does not indicate that the commissioner considered the guidelines prior to accepting the stipulated amount in 2015. However, unless there is a deviation, the court is not required to provide any oral or written reasons regarding its acceptance of the stipulated amount. Therefore, the absence of an explicit indication from the commissioner in the record regarding his review of the support guidelines does not require this Court to find that he did not review them prior to accepting the stipulated amount or that the stipulated child support award is flawed. Accordingly, we find this assignment of error is without merit.

In her second assignment of error challenging the trial court's denial of her request to increase the child support award, Ms. Barnett alternatively argues that the trial court erred when it found she did not prove a material change in circumstances existed to modify the child support award.

An award of child support is entitled to great weight and will not be disturbed on appeal absent an abuse of discretion. *Duffel v. Duffel*, 10-274 (La. App. 5 Cir. 11/9/10), 54 So.3d 675, 677. The Louisiana Child Support Guidelines set forth the method for implementation of the parental obligation to pay child support. La. R.S. 9:315, *et seq.* The guidelines are to be used in any proceeding to establish or modify child support. La. R.S. 9:315.1(A). The standard for modification of a child support award is set forth in La. C.C. art. 142 and La. R.S. 9:311(A)(1). *Hall v. Hall*, 11-60 (La. App. 5 Cir. 5/24/11), 67 So.3d 635, 639, *writ denied*, 11-1752 (La. 10/14/11), 74 So.3d 214. La. C.C. art. 142 provides, "An award of child support may be modified if the circumstances of the child or of either parent materially change and shall be terminated upon proof that it has become unnecessary." La. R.S. 9:311(A)(1) provides, "An award for support shall not be modified unless the party seeking the modification shows a material change

in circumstances of one of the parties between the time of the previous award and the time of the rule for modification of the award."

Ms. Barrett testified that both in 2015 and at the time of the hearing in November 2019, she received social security disability benefits for the children and herself as a result of Mr. Barrett's disability. In 2015, she received $166.00 per month per child for a total of $498.00 for the children. She also received $166.00 for herself. At the time of the hearing in November 2019, the amount of the social security disability benefits increased slightly to $180.00 dollars per child for a total of $540.00, and $180.00 for Ms. Barrett. In addition to these social security disability benefits, Ms. Barrett testified that since the 2015 consent judgment, she now receives $611.00 per month for supplemental security income payments (SSI) for their son diagnosed with autism. Mr. Barrett does not dispute Ms. Barrett's position that the SSI payment for their autistic child should not be included in the child support calculation and is not attributable to Ms. Barrett as income.[6]

Ms. Barrett testified that she is unable to work full time because she transports their autistic child to and from therapy four times a week. She indicated that in 2019, she worked part-time and earned $962.90 in total gross income for the year. Because the children were all over the age of five and she earned less than the minimum wage, the court attributed a minimum wage income in the amount of $1,256.67 per month to Ms. Barrett.

Ms. Barrett also argues that material changes exist with respect to Mr. Barrett's income. Mr. Barrett testified that in 2015, his only source of income was social security disability payments. He stated that in 2019 at the time of the

---

[6] Ms. Barrett argues that her increased costs to transport their son to therapy constitutes a change in circumstances to increase the child support award. She indicates on her expense sheet that the cost to transport their son to therapy is $147.00 per month. We agree with Mr. Barrett that the $611.00 per month that Ms. Barrett receives in SSI benefits is sufficient to cover these costs and does not require an increase in the child support award, particularly since the amount is not deducted from the child support obligation.

hearing, he received $1,312.00 per month in social security disability benefits, and this was roughly the same amount he received in 2015. He also testified that since 2015, he went to school to learn massage therapy and tried to start a business he could operate out of his home. He indicated that despite efforts to market the business, he currently only had two clients. He also testified that he had surgery on his wrist in 2019 and may require another surgery, which decreased the income he was able to earn as a massage therapist. He testified that in 2019, he earned $146.87 per month after expenses for his massage therapy business.

Ms. Barrett argues that the trial court should have attributed an additional $2,110.00 per month to Mr. Barrett for his massage therapy business. She does not base this on evidence that Mr. Barrett actually earned this amount per month in 2019. Rather, she argues that in 2018, Mr. Barrett completed a mortgage application and listed his monthly income as $1,726.00 per month, which included his disability benefits of $1,312.00. This indicates that in 2018, Mr. Barrett earned $412.00 per month for his massage therapy business. However, he testified that he earned less per month in 2019 due to his wrist surgery.

Ms. Barrett also argued that the trial court should attribute additional income to Mr. Barrett because he had $32,000.00 in a savings account and purchased a more expensive home for $270,000.00. Mr. Barrett explained, however, that this sum was the remainder of settlement funds he received as a result of litigation he filed against Ms. Barrett's stepfather after the hunting incident. He also explained that he used the settlement funds to remodel and sell his own home so he could purchase a newer home closer to a location where he could fish with the children. Mr. Barrett testified that Ms. Barrett also received $100,000.00 in settlement funds for the accident. Considering the foregoing, we do not find that the trial court abused its discretion by declining to attribute $2,110.00 per month to Mr. Barrett for his massage therapy business.

Ms. Barrett finally argues in the alternative that she demonstrated a material change in circumstances and the trial court should have ordered Mr. Barrett to pay her $202.50 per month in child support without credit for the $540.00 in social security disability benefits the children receive due to his disability. Ms. Barrett, however, bases this argument on her position that the disability benefits should be deducted from the basic support obligation of $915.00, which is calculated using the monthly minimum wage salary of $1,256.67 for Ms. Barrett and $1,458.87 for Mr. Barrett. As explained above, however, La. R.S. 9:315.7(D) clearly required the trial court to apply the social security disability benefits as a credit toward Mr. Barrett's support obligation, rather than deducting it from the basic support obligation of $915.00.

Based on their incomes, Mr. Barrett owes 54% of the basic support obligation of $915.00, which is $494.10. This amount is less than the $498.00 previously stipulated to by the parties in 2015. Furthermore, Mr. Barrett's credit is now $540.00 due to the slight increase in the benefits the children receive due to his disability. Accordingly, we find that the trial court did not abuse its discretion by finding that Ms. Barrett failed to prove a material change in circumstances and by denying her request to modify the child support award.

*Dependent Tax Deduction*

In her third and fourth assignments of error, Ms. Barrett argues that the trial court erred 1) in awarding Mr. Barrett the right to claim one minor child as a dependent for tax purposes; and 2) by placing the burden on her to show she would be significantly harmed by allowing Mr. Barrett to claim one of the children.

At the time the trial court entered the February 4, 2020 judgment, La. R.S. 9:315.18, the provision governing the right to claim a child as a dependent for tax purposes, provided as follows:

A. The amounts set forth in the schedule in R.S. 9:315.19 presume that the custodial or domiciliary party has the right to claim the federal and state tax dependency deductions and any earned income credit. However, the claiming of dependents for federal and state income tax purposes shall be as provided in Subsection B of this Section.

B. The non-domiciliary parent whose child support obligation equals or exceeds fifty percent of the total child support obligation shall be entitled to claim the federal and state tax dependency deductions if, after a contradictory motion, the judge finds both of the following:

(a) No arrearages are owed by the obligor.

(b) The right to claim the dependency deductions or, in the case of multiple children, a part thereof, would substantially benefit the non-domiciliary party without significantly harming the domiciliary party.[7]

The trial court's decision whether to award a non-domiciliary parent dependent tax deductions is subject to the manifest error/clearly wrong standard. *State, Dept. of Social Services v. Mason*, 09-1088 (La. App. 5 Cir. 6/29/10), 44 So.3d 744, 748. The party seeking to have the dependent deduction taken away from a domiciliary parent has the burden of proving that no arrearages are owed and that it would substantially benefit the non-domiciliary party without significantly harming the domiciliary parent. *Id.* at 749.

In the February 4, 2020 judgment, the trial court ruled that Mr. Barrett was entitled to claim "federal and state tax dependency deductions for the second child." In its reasons, the trial court stated Ms. Barrett did not provide tax returns for the court to review and did not provide any testimony indicating that she would be significantly harmed by allowing Mr. Barrett to claim one child. The trial court also noted that the children receive social security benefits due to Mr. Barrett's disability and determined that allowing Mr. Barrett to claim at least one child would benefit him without significantly harming Ms. Barrett.

---

[7] In La. Act. 2020, No. 177, § 1, the legislature enacted amendments to this provision that were not effective until January 1, 2021.

Ms. Barrett argues on appeal that the trial court erred in awarding Mr. Barrett a tax dependency deduction because he only offered guesses as to the benefits he would receive by claiming a child and did not provide any evidence to prove the tax deduction would substantially benefit him without harming her. She further argues that the trial court improperly shifted the burden to her to show significant harm.

In opposition, Mr. Barrett argues that he testified and proved he would substantially benefit from a tax dependency deduction for one child. He further argues that the trial court reviewed all of the relevant evidence and properly determined that Ms. Barrett would not be significantly harmed. Mr. Barrett testified that he researched the benefits he could receive and indicated that he could become eligible for SNAP (Supplemental Nutritional Assistance Program), and possibly other services and governmental assistance, if he could claim a dependent. He also indicated that he had to pay taxes on his social security income and believed he could obtain a better tax deduction if he could claim one of the children. He also testified that Ms. Barrett had never filed a tax return. Ms. Barrett admitted that she did not file tax returns in the past because it was not required due to her lack of income. She indicated that she expected to file a return for 2019 because she earned income. However, as explained above, she was only able to earn $962.90 in gross income in 2019 working on a part-time basis.

Considering Mr. Barrett's testimony regarding the benefits he could receive, as well as the fact that Ms. Barrett did not file tax returns in the past and only earned minimal income in 2019, the trial court's decision to allow Mr. Barrett to claim a part of the dependency deductions was not manifestly erroneous because it substantially benefitted Mr. Barrett without significantly harming Ms. Barrett.

*Extracurricular Expenses*

In her fifth assignment of error, Ms. Barrett argues that the trial court erred by failing to order Mr. Barrett to pay his pro rata share of the extracurricular expenses for sports that she incurs for the children.

The trial court ordered Mr. Barrett to pay half of the total amount incurred for baseball activities, not to exceed $75.00 per child. Ms. Barrett contends the children engage in additional sports that are important to the children, particularly their autistic child. She argues the children are excited about their games and practices, and meet many new friends through sports. She testified that Mr. Barrett agreed to assist with baseball expenses, but then refused to pay when she presented him with the receipt. She contends that the trial court's ruling limiting expenses to $75.00 per child for baseball violates La. R.S. 9:315.6, which provides that expenses for extracurricular activities should be added to the child support obligation so that each party pays their pro rata share.[8]

In opposition, Mr. Barrett argues that an order to add expenses for extracurricular activities under La. R.S. 9:315.6 is discretionary with the court. He explains that the only extracurricular activity he agreed upon with Ms. Barrett was baseball and admits that he agreed to help with the expenses. He stated that when she asked him to pay $333.50 for his half of baseball expenses, he did not pay because he did not trust the amount.

He also argues that Ms. Barrett enrolled the children in other activities without notifying him of her decision or considering his income. He explained during the hearing that he has several good reasons for wanting to limit the amount of sports the children play, including his income, his limitations as a blind man and

---

[8] La. R.S. 9:315.6 provides that "[b]y agreement of the parties or order of the court, the following expenses incurred on behalf of the child may be added to the basic child support obligation: . . . (3) Special expenses incurred for child rearing intended to enhance the health, athletic, social or cultural development of a child, including but not limited to camp, music or art lessons, travel, and school sponsored extracurricular activities."

his feeling that the children's interests would be better served by limiting their sports. He explained that he cannot drive to practices and games and cannot afford to pay for transportation back and forth when the children are visiting with him. He also believes that since he has limited time with the children, they experience more value by engaging in interactive activities with him, rather than on a field he cannot see.

After considering all of this testimony and evidence, the trial court concluded that $75.00 per child for baseball is a reasonable amount to add to Mr. Barrett's child support obligation. We do not find that the trial court abused its discretion.

*Overnight Guests*

Ms. Barrett next contends that the trial court committed legal error in adopting the hearing officer's recommendation to allow overnight guests of the opposite sex if the party has been in a committed relationship with the person for over a year. She argues that it is to the moral detriment of the children. She also complains that the children have fallen asleep in the same bed with Mr. Barrett and his girlfriend in violation of their agreement not to sleep in the same bed with the children, discussed more fully below in the assignment of error regarding Ms. Barrett's rule to hold Mr. Barrett in contempt.

In opposition, Mr. Barrett argues that the trial court did not abuse its discretion by providing an exception for a committed relationship. He argues that his girlfriend is also blind and they have been in a committed relationship since April 2017. He explains that they have been living together for two years and it was not unreasonable for the trial court to create an exception so that she does not have to leave the home when he has overnight visitation with the children. He also argues that there was no evidence presented at trial that this harmed the children in any way. Mr. Barrett testified that the children loved his girlfriend.

Considering the foregoing, we do not find that the trial court erred by adopting the hearing officer's recommendation to allow overnight guests of the opposition sex if the party has been in a committed relationship for over a year with the guest.

*Contempt*

In her seventh and eighth assignments of error, Ms. Barrett argues that the trial court committed legal error by 1) failing to find Mr. Barrett willfully disobeyed orders issued by the trial court in the December 12, 2016 judgment; and 2) failing to hold Mr. Barrett in contempt and sanctioning him.

A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. La. C.C.P. art. 221. Contempt of court can be direct or constructive. *Id.* Constructive contempt is defined in part as the willful disobedience of any lawful judgment or order of the court. La. C.C.P. art. 224. To find a person guilty of constructive contempt, it is necessary to find that he violated the order of court intentionally, knowingly and purposefully without justifiable excuse. *Short v. Short*, 12-312 (La. App. 5 Cir. 11/13/12), 105 So.3d 892, 896. A trial court is vested with great discretion in determining whether circumstances warrant holding a party in constructive contempt of court pursuant to La. C.C.P. art. 224 for willful disobedience of a court order. *Id.*

Ms. Barrett argues that the trial court's refusal to hold Mr. Barrett in contempt of court is contrary to the law and evidence. The trial court explained in its reasons for judgment that it denied Ms. Barrett's rule for contempt because the reasons Mr. Barrett provided for failing to follow the judgment on occasion were valid and reasonable.

In the December 12, 2016 judgment, the parties agreed that they would not use vulgarity while in the presence of the children, would not make "statements

against any third parties while in the children's presence," and would not bathe and/or sleep in the same bed with the children. In the co-parenting guidelines, the parties also agreed that if either parent required child care for twenty-four hours or longer, the other parent shall have the first option to provide the care.

Ms. Barrett first argues that Mr. Barrett admitted that he violated the agreement not to sleep in the same bed with the children on more than one occasion and that both he and his girlfriend slept in the same bed as the children. Mr. Barrett explained at the hearing that the circumstances were not planned and that they fell asleep in bed watching television. He also explained that he had an Apple TV in his room that is accessible for him due to his blindness and he had them watch television there so he could control what they were watching and enjoy movies together. He explained that usually when they wake up, they put the children in their beds. He admitted that he became too relaxed with the situation and apologized. He denied that he intentionally slept in the same bed with his children.

Ms. Barrett next argues that Mr. Barrett called her stepfather a "fat ass" in front of their youngest child at a pre-K graduation. Mr. Barrett denied that this occurred during his testimony. In his appellate brief, Mr. Barrett argues that even if this did occur, it could be considered an unintentional utterance where his emotions prevailed considering that his blindness resulted from the hunting incident with Ms. Barrett's stepfather.

Finally, Ms. Barrett contends that Mr. Barrett violated the agreement in the co-parenting guidelines to offer a right of first refusal if the parent requires child care for over 24 hours. Ms. Barrett contends that Mr. Barrett violated this provision on two occasions when he went out of town for the weekend and the children visited with his mother. Mr. Barrett admitted that this occurred on two weekends when he was invited to go to a handicap hunt. He explained that he

forgot about the obligation and that he asked Ms. Barrett to switch weekends on both of those occasions, but she refused. He also testified that he was aware of times when Ms. Barrett did not offer him the opportunity to care for the children when she was away for more than 24 hours.

Based on the foregoing, we do not find that the trial court abused its vast discretion in denying the rule for contempt and finding that Mr. Barrett provided reasonable excuses when he neglected to follow provisions of the consent judgment.

*Custody*

In her final assignment of error, Ms. Barrett contends that the trial court abused its discretion by finding that she failed to show a material change in circumstances and by finding joint custody is in the best interest of the children.

When a party seeks to change custody entered pursuant to a consent judgment or stipulation of the parties, the party seeking modification must prove: 1) a material change in circumstances since the original custody decree was entered; and 2) that the proposed modification is in the best interest of the child. *Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731, 738. The primary consideration in custody disputes is always the best interest of the children. La. C.C. art. 131. When the parents cannot agree to a custody arrangement, the court shall award joint custody unless it is shown by clear and convincing evidence that sole custody is in the best interests of the children. La. C.C. art. 132.

La. C.C. art. 134 sets out fourteen non-exclusive factors for the court to consider in awarding custody.[9] The trial court is not bound to make a mechanical

---

[9] The relevant factors include: (1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration; (2) The love, affection, and other emotional ties between each party and the child; (3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child; (4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs; (5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment; (6) The permanence, as a family unit, of the existing or proposed custodial home or homes; (7) The moral fitness of each party, insofar as it affects the welfare of the child; (8) The history of substance abuse, violence, or criminal activity of any party; (9) The mental and

evaluation of all the factors in La. C.C. art. 134, but should decide each case on its own facts in light of those factors. *Robertson v. Robertson*, 10-926 (La. App. 5 Cir. 4/26/11), 64 So.3d 354, 363. These factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. *Id.* Each child custody case must be viewed in light of its own particular set of facts and circumstances with the paramount goal of reaching a decision that is in the best interests of the children. *Id.*

On appellate review, the trial court's custody determination is entitled to great weight and will not be disturbed absent a clear showing of an abuse of discretion. *Johnson v. Clofer*, 18-119 (La. App. 5 Cir. 6/27/18), 251 So.3d 597, 600; *Bridges v. Bridges*, 09-742 (La. App. 5 Cir. 2/9/10), 33 So.3d 914, 918.

On appeal, Ms. Barrett argues that the trial court abused its discretion in failing to find she proved a material change in circumstances warranting sole custody in her favor. She claims that as a result of Mr. Barrett's vision impairment, their oldest son was injured by a fishhook while they were fishing, and their autistic son fell into the river and suffered injury in a pool as a result of the alleged lack of supervision by their father.

In response, Mr. Barrett testified that he and their oldest son fished together since the child was two years old. He explained that the fishhook got caught in the child's finger when he accidently grabbed the rod instead of the handle of the pole. Mr. Barrett testified that the accident had nothing to do with his lack of sight. With respect to the claim that their autistic son fell in the Mississippi River, Mr. Barrett testified that Ms. Barrett's account of the event was inaccurate. He

physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by the other parent shall not be grounds for denying that parent custody; (10) The home, school, and community history of the child; (11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference; (12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party; (13) The distance between the respective residences of the parties; and (14) The responsibility for the care and rearing of the child previously exercised by each party. La. C.C. art. 134.

explained that he slipped on some algae on the edge of the batture area, not on the river, and the water where he and their son fell was only up to his waist. He further testified that their son did not sustain any injuries. Mr. Barrett also testified that he did not recall any incident with their autistic son in his pool. Mr. Barrett further testified that he always takes great care to ensure the location and safety of his children when they are fishing and in the pool by requiring them to constantly respond to him verbally. Finally, he also testified that the children have suffered injuries while in the custody of Ms. Barrett.

Ms. Barrett also cites material changes in circumstances since 2016 because the children are now older and enrolled in school and in extracurricular activities. She claims that their disagreement over sports is affecting the children and the positive benefits they receive from participation in sports. She admitted on cross-examination that the children love spending time with their father and fishing with him.

Mr. Barrett testified that he did not object to the children's participation in sports, but felt they were engaging in too many different extracurricular activities. Further, due to his sight impairment, it is difficult for him to get the children to practices and games when they are visiting. He asked that they compromise by picking one sport, rather than playing multiple sports year round. He further testified that Ms. Barrett was setting him up for failure as a father by enrolling the children in multiple sports and then refusing to assist him in getting the children to practices and games during his visitation.

Ms. Barrett also points to additional changes since 2016, including Mr. Barrett's cohabitation with his sight-impaired girlfriend and the diagnosis of the parties' middle child with autism. The record does not contain evidence of how the presence of Mr. Barrett's girlfriend has negatively affected the children. With respect to their autistic child, Ms. Barrett contends that her need for additional

financial and transportation assistance from Mr. Barrett has led to disputes and tension between the parties that affects the welfare of the children. However, we do not find that these issues rise to the level of clear and convincing evidence requiring a change to sole custody.

Ms. Barrett also contends the trial court erred by failing to find that a change from joint to sole custody was in the best interests of the children. She again points to the risk of harm the children are placed in when fishing with Mr. Barrett, including exposure to alligators and poisonous snakes. In response, Mr. Barrett argues that he provided extensive testimony regarding his knowledge of the area where they fish and the precautions he takes as a blind man to ensure the safety of his children. He also explained that he moved to a house closer to the river batture so he could walk to the area and avoid having to cross busy streets with his children.

Ms. Barrett also objects to the trial court's decision to allow Mr. Barrett to fish with the children without a sighted person and to switch the order of weekend visitations. The trial court found that the children have been fishing with their father for years without supervision and he is "very knowledgeable about this activity." It further noted the children's enjoyment of this activity and their ability to walk to the river. The trial court found that it "does not find it fair or legal to prohibit Mr. Barrett from fishing with his children, solely because he is blind." At the same time, the trial court struck a balance to further insure the children's safety by requiring the children to wear life jackets while fishing and limiting unsupervised fishing to the river batture. Further, altering the timing of the weekend visitations benefits the children by allowing them to spend time with their cousins and presumably would result in the presence of more sighted individuals during their visitation with Mr. Barrett.

Based on the foregoing, we do not find that the trial court abused its discretion by finding that Ms. Barrett did not show a material change in circumstances to warrant a change to sole custody or that sole custody would not be in the best interests of the children. The majority of issues raised by Ms. Barrett stem from Mr. Barrett's sight impairment. However, Mr. Barrett was sight impaired when the prior order providing for joint custody was entered into by the parties. Ms. Barrett admits that her children love their father and enjoy spending time with him and fishing with him. Mr. Barrett admits that his sight impairment creates difficulties in his ability to assist in transporting the children. However, granting sole custody to Ms. Barrett will not alleviate this issue. This requires the parties to put aside their differences and engage in compromise and cooperation for the benefit of their children.

**<u>DECREE</u>**

Considering the foregoing, we affirm the trial court's February 4, 2020 judgment.

**<u>AFFIRMED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**FEBRUARY 24, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 20-CA-266

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE JUNE B. DARENSBURG (DISTRICT JUDGE)
LORNA P. TURNAGE (APPELLANT)          A. SCOTT TILLERY (APPELLEE)

**MAILED**
NO ATTORNEYS WERE MAILED